GEORGE H. BRASIER, APPELLANT, v. R. F. CRIBBETT ET AL., APPELLEES.

88 N. W. 2d 235

Filed February 28, 1958. No. 34291.

■■■■■■■■■

■■■■■

■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■

■■■■■■■■   ■■■■■■

*J. A. Hayward,* for appellant.

*Kanouff & Brown, Lloyd E. Chapman,* and *Louis E. Dolezal,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action at law brought in the district court for Saunders County by George H. Brasier, plaintiff, against R. F. Cribbett, the City of Wahoo, and the mayor and members of the city council of the city as defendants. Service of process was had on the defendants R. F. Cribbett and the City of Wahoo, but not on the members of the city council of the city. The mayor and members of the city council made no appearance in this case. Therefore, the defendants may be designated as R. F. Cribbett and the City of Wahoo. The defendants R. F. Cribbett and the City of Wahoo demurred to the plaintiff's petition. The trial court sustained both demurrers. The plaintiff filed a motion for rehearing. The trial court overruled the motion for rehearing. The plaintiff elected to stand on his petition, and the trial court dismissed the plaintiff's petition. The plaintiff appeals.

The plaintiff's petition, insofar as it need be considered here, alleged in substance that the City of Wahoo is a duly constituted city of the second class; that the plaintiff is the owner of a licensed aircraft and is a licensed pilot; and that R. F. Cribbett was the lessee and operator of the Wahoo Municipal Airport pursuant to a valid lease agreement entered into by him and the city council of the City of Wahoo, the lease agreement being attached to the petition and made a part thereof by refer-

ence.  The plaintiff further alleged that he entered the Wahoo Municipal Airport on August 18, 1955; that he surveyed his approach to the ramp upon landing and proceeded to that point in the apparent route; that he applied the necessary power to the aircraft to consummate the approach and, owing to an unmarked obstruction on the approach to said ramp left by the carelessness and negligence of the defendants, plaintiff's aircraft came in contact with said obstruction, a drainage pipe, while under power, which caused the aircraft to tip forward striking the propeller against the ground, damaging it beyond repair and concurrently causing the left tire to blow out and the landing gear to collapse, thereby causing the left wing to drop to the ground damaging the landing gear assembly which was beyond repair, and damaging the wing tip which was adjudged by the repair firm as not being absolutely necessary to repair but was in effect damaged; and that the injuries to the plaintiff's aircraft amounted to $303.43.  For the second cause of action the plaintiff alleged that he sustained and suffered damages in the sum of $1,000 for loss of use and rental of said aircraft for the purpose used by him in his enterprise at the rate of $50 a day. The petition further alleged that the plaintiff made due claim upon the City of Wahoo, and the claim was denied; that notice of appeal had been given concurrently with the filing of the petition; and that the plaintiff, as such claimant, appealed from the decision denying the claim. The prayer was for judgment in the amount of $1,303.34, against the defendants and each of them, and for costs.

"An exhibit incorporated in a pleading is a part of it for all purposes in the case and it may be considered in deciding if the pleading states a cause of action or a defense."  Reller v. Ankeny, 160 Neb. 47, 68 N. W. 2d 686.

We herewith set forth exhibit "A" attached to the petition which, in substance, is an agreement made Sep-

tember 12, 1951, by and between the City of Wahoo, party of the first part, and R. F. Cribbett, party of the second part. It provided that the party of the first part was the owner of the Wahoo Municipal Airport and the party of the second part was desirous of leasing a part of said airport. It was agreed that the party of the second part should have a lease upon all of the airport except 60 acres which had theretofore been leased to the Wahoo Milling Company for a period of 2 years from the date thereof, with an option of 3 additional years thereafter on a year to year term. The instrument further provided that the party of the second part was to operate the airport for the general use of the public and provide facilities, services, and commodities with a charge therefor comparable to those offered by like municipal airports; that the party of the second part was to maintain the administration buildings, city hangars, and runways, making necessary repairs and construction with the consent of and at the expense of the party of the first part; that the party of the second part was to maintain a telephone in the administration building, pay for the same, and pay the electricity bill for the maintenance of the city-owned hangars and administration building and provide adequate tie-down facilities for airplanes; that the party of the second part was to make an inspection of the said premises at least once a week and after storms to determine if any dangerous conditions or hazards existed on said airport; that the party of the second part, for his services, was to receive free hangar use for one plane, free use of the administration building and airport; that the party of the second part was to retain all hangar rentals due the city on other hangars than the one used by him, and to retain all profits on oil, gasoline, and commodities sold by him on the premises; that the party of the second part should enforce all rules and regulations of the Civil Aeronautics Administration and the State Department of Aeronautics of the State of

Nebraska, and should further enforce any rules, regulations, orders, or policies of the council of the City of Wahoo theretofore adopted; that the party of the first part should not be liable for any act or acts of the party of the second part, nor should the party of the second part bind, or attempt to bind, the city in any manner; and that nothing therein contained should be construed as creating the relation of employer and employee between the parties, the party of the second part being deemed at all times an independent contractor. It was further agreed that the party of the second part should at all times provide workmen's compensation insurance for any employees hired by him in any capacity at said airport.

The defendants' demurrers to the plaintiff's petition were primarily based on the grounds that the facts alleged therein were not sufficient to constitute a cause of action.

On March 9, 1957, the court sustained the demurrers of defendants R. F. Cribbett and the City of Wahoo, and gave the plaintiff 30 days to file an amended petition.

On March 23, 1957, the plaintiff elected to stand upon his petition.

On April 11, 1957, the plaintiff filed a motion for rehearing, moving the court to vacate its judgment dismissing the proceedings.

On May 1, 1957, the plaintiff filed a motion to withdraw his motion for rehearing. This motion was sustained. The plaintiff having elected to stand on his petition, the court dismissed the plaintiff's petition. On the same day the plaintiff refiled his motion for rehearing.

On May 7, 1957, the cause came on for hearing on the plaintiff's motion for rehearing and was taken under advisement.

On June 17, 1957, the plaintiff's motion for rehearing was overruled.

On June 20, 1957, the plaintiff gave notice of appeal.

The defendant R. F. Cribbett contends that where a demurrer to a petition is sustained, the demurrer admits all of the material facts averred in the petition.

A general demurrer admits all allegations of fact in the pleading to which it is addressed, which are issuable, relevant, material, and well pleaded; but does not admit the pleader's conclusions of law or fact. Babin v. County of Madison, 161 Neb. 536, 73 N. W. 2d 807.

The defendant R. F. Cribbett further contends that after the sustaining of the defendants' demurrers and on May 1, 1957, when the plaintiff elected to stand on his petition and the trial court dismissed his petition, this constituted a final appealable order; that section 25-1142, R. R. S. 1943, defining a motion for new trial, provides in part: "A 'new trial' is a reexamination in the same court of an issue of fact after a verdict by a jury, report of a referee, or a decision by the court"; and that in the instant case there were no facts to be reexamined, they were admitted. The defendant further asserts that it is not a matter of a motion for a new trial being necessary for a review of the proceedings, it is a matter of a motion for a new trial as defined in section 25-1142, R. R. S. 1943, being impossible for the district court to grant, and a matter of the impossibility of the appellant in the instant case to have made a motion which would be within the scope of section 25-1142, R. R. S. 1943.

It is apparent from what has been said above with respect to defendant Cribbett's contention, that he also contends that there is nothing before this court to determine in this appeal, for the reason that the notice of appeal was not given until June 20, 1957, and therefore the appeal is out of time within the contemplation of section 25-1912, R. R. S. 1943.

Section 25-1912, R. R. S. 1943, provides that appeals to the Supreme Court must be initiated within 1 month after the rendition of the judgment, decree, or final order, or within 1 month from the overruling of a motion for a new trial, by filing with the clerk of the district

court a notice of intention to appeal signed by the appellant or the attorney for the appellant, and by depositing with said clerk the docket fee required by law.

We believe the following to be decisive of the above contention.

In the case of McGerr v. Marsh, 148 Neb. 50, 26 N. W. 2d 374, we overruled the holding in Huffman Automobile Co. v. Moline Plow Co., 110 Neb. 279, 193 N. W. 747, that the filing of a motion for a new trial in a case in which a judgment was entered dismissing the action before any evidence was taken is of no avail to extend the time for taking of the appeal.

In Harkness v. Central Nebraska Public Power & Irr. Dist., 154 Neb. 463, 48 N. W. 2d 385, we held: "When a demurrer to a petition is sustained, the plaintiff's action dismissed, and a motion for a new trial and rehearing is filed, in the event it is ruled upon, then under section 25-1912, R. R. S. 1943, the time for appeal begins to run from the date of the ruling on the motion for a new trial and rehearing. During the pendency of a motion for a new trial timely filed, no appealable order is considered as having been rendered until the motion for a new trial is disposed of." Quoting from McGerr v. Marsh, *supra*, we said: " 'If the defeated litigant desires to give the trial court an opportunity to correct his judgment, if he has made an error, by filing a motion for a new trial or rehearing, it is our opinion that the time for appeal to this court should not be cut off until that motion has been overruled by the district court, and it stands to reason that the rule should be uniform in all cases.' The phrase 'in all cases' applies both in actions at law or suits in equity."

In Harkness v. Central Nebraska Public Power & Irr. Dist., *supra*, the court went on to say: "The general rule as stated by text writers is that a pending motion for a new trial seasonably filed keeps the cause in the trial court and so long as it remains undisposed of there can be no final judgment within the meaning of

the statutes regulating appeals. As soon as a motion for a new trial is filed the district court's jurisdiction over the case is retained and continued. During the pendency of a motion for a new trial no appealable order is considered as having been rendered until the motion for a new trial is disposed of."

We conclude that the contention of the defendant Cribbett is not sustainable.

The plaintiff assigns as error that the trial court erred in dismissing the plaintiff's petition; and that the trial court erred in failing to find that the Wahoo Municipal Airport was being operated outside the scope and protection of the Revised Airports Act, sections 3-201 to 3-238 and section 18-1502, R. R. S. 1943, either actually or constitutionally. The statutes here involved are as follows.

Section 3-238, R. R. S. 1943, provides: "Sections 3-201 to 3-238, and 18-1502 may be cited as the 'Revised Airports Act.'"

Section 3-237, R. R. S. 1943, provides for the manner in which the act shall be construed: "Sections 3-201 to 3-238, and 18-1502 shall be so interpreted and construed as to make uniform so far as possible the laws and regulations of this state and other states and of the government of the United States having to do with the subject of aeronautics."

Section 3-206, R. R. S. 1943, provides: "The (1) acquisition of any lands for the purpose of establishing airports or other air navigation facilities, the (2) acquisition of airport protection privileges, the (3) acquisition, establishment, construction, enlargement, improvement, maintenance, equipment and operation of airports and other air navigation facilities and the (4) exercise of any other powers herein granted to municipalities are hereby declared to be public, governmental and municipal functions, exercised for a public purpose, and matters of public necessity. Such lands and other property, easements and privileges acquired and used by

such municipalities in the manner and for the purposes enumerated in sections 3-201 to 3-238, and 18-1502 shall and are hereby declared to be acquired and used for public, governmental and municipal purposes and as a matter of public necessity."

Section 3-207, R. R. S. 1943, provides: "No action or suit sounding in tort shall be brought or maintained against any municipality, or the officers, agents, servants or employees thereof, on account of any act done in or about the construction, enlargement, improvement, maintenance, operation, regulation, superintendence or management of any airport or other air navigation facility."

Subdivision (2) of section 3-215, R. R. S. 1943, provides that the city shall be authorized to adopt and amend all needful rules, regulations, and ordinances for the management, government, and use of any properties under its control, whether within or without the territorial limits of the municipality.

Subdivision (3) of the above section relates to the leasing of such airports, other air navigation facilities or real property acquired or set apart for airport purposes to private parties, any municipal or state government, the national government, or any department of any such government for operation, etc., and provides that in each case the public shall not be deprived of its rightful, equal, and uniform use thereof.

Section 18-1501, R. R. S. 1943, relates to aviation fields, their acquisition, procedure, and rates.

Section 18-1506, R. R. S. 1943, provides: "Any property acquired, owned, controlled or occupied by a city for the purposes enumerated in section 18-1501, shall be and is hereby declared to be acquired, owned, controlled and occupied for a public purpose, and as a matter of public need."

While subdivision (3) of section 3-215, R. R. S. 1943, and section 18-1509, R. R. S. 1943, relate to the right of a municipality to lease an airport or other air navigation

facilities under the circumstances as provided by said sections of the statute, we are, in the instant case, primarily and specifically concerned with sections 3-206 and 3-207, R. R. S. 1943.

While there is a question presented in the instant case as to whether the instrument here being considered with the petition is or is not a lease and the relation of landlord and tenant exists, as will appear later in the opinion, we do not deem the sections of the statutes referred to above relating to the right of a municipality to lease its airport or air navigation facilities necessary to a determination of this appeal.

In Greenwood v. City of Lincoln, 156 Neb. 142, 55 N. W. 2d 343, 34 A. L. R. 2d 1203, the court said that a municipal corporation occupies a dual relation to its citizens and the public. In the performance of its governmental or public duties it is the representative of the state. It has the governmental powers conferred and the burdens imposed upon it by the Legislature, and is entitled to the privileges, immunities, and exemptions given it by law. The governmental functions of a city are for the benefit of the public and not the corporate entity. A municipal corporation has and is obligated also to perform corporate duties, those expressly imposed upon it by the Legislature, and also those that devolve upon it by reason of the governmental powers and privileges it has, such as the duty to maintain its streets, alleys, and sidewalks in a reasonably safe condition for their intended use. Its corporate functions are for the benefit of the city as well as advantageous to the public. A municipal corporation is sometimes authorized to own and conduct a business or commercial enterprise and when it engages therein it is said to be acting in its private or proprietary capacity. It has no duty to conduct such an undertaking and when it does it is entirely voluntary on its part and it thereby enters into a third relation distinct from the dual relations above noted. While occupying this third

relation it is engaged in conducting a business and is subject to the law and procedure applicable to a private corporation or person conducting a like business. It has in that regard no governmental functions or corporate duties and has no more privileges or exemptions than a private corporation. See, also, Henry v. City of Lincoln, 93 Neb. 331, 140 N. W. 664, 50 L. R. A. N. S. 174; Platte Valley Public Power & Irr. Dist. v. County of Lincoln, 144 Neb. 584, 14 N. W. 2d 202, 155 A. L. R. 412.

In Nelson-Johnston & Doudna v. Metropolitan Utilities Dist., 137 Neb. 871, 291 N. W. 558, this court said: "The powers granted to a municipal corporation can be divided into two general classes,—the one including those which are legislative, public or governmental, and import sovereignty; the second, those which are proprietary or quasi private, conferred for the private advantage of the inhabitants and the city itself as a legal entity."

What is a public purpose is primarily for the Legislature to determine. However, in Platte Valley Public Power & Irr. Dist. v. County of Lincoln, *supra,* we said: "A public purpose has for its objective the promotion of the public health, safety, morals, security, prosperity, contentment, and the general welfare of all the inhabitants." See, also, United Community Services v. The Omaha Nat. Bank, 162 Neb. 786, 77 N. W. 2d 576.

In Nelson-Johnston & Doudna v. Metropolitan Utilities Dist., *supra,* we said: "The authority given a municipality to engage in the operation of a business enterprise carries with it the power to conduct it in the same manner in which a private corporation would deal with its property under similar circumstances." See, also, United Community Services v. The Omaha Nat. Bank, *supra;* State ex rel. Johnson v. County of Gage, 154 Neb. 822, 49 N. W. 2d 672; Henry v. City of Lincoln, *supra.*

The question to be determined in this appeal is whether or not the City of Wahoo, on August 18, 1955,

was operating the Wahoo Municipal Airport as a public governmental function or in a proprietary capacity.

The second question to determine is whether or not the defendant R. F. Cribbett was a lessee of the Wahoo Municipal Airport at that time or just what his relationship was with respect to the operation of the airport.

In the case of Rhodes v. City of Asheville, 230 N. C. 134, 52 S. E. 2d 371, it was held on rehearing, 230 N. C. 759, 53 S. E. 2d 313: "The distinction between a governmental and proprietary function of a municipal corporation is a judicial and not a legislative question, and legislative declaration as to the nature of the authority delegated by the statute is not controlling." In the original opinion the court said: "And even though a municipal activity has been held to be for a public purpose, we may still have difficulty in determining whether such activity is a corporate or proprietry (sic) function, and is therefore subject to suits in tort, or a governmental function and immune from such suits." The State of North Carolina had in force a statute that was similar to section 3-206, R. R. S. 1943, cited as G. S. 63-50, which declares the construction, maintenance, and operation of an airport by municipalities pursuant to the provisions of Chapter 63 of the General Statutes of North Carolina, "to be public, governmental and municipal functions exercised for a public purpose and matters of public necessity," and the use of the property and equipment in connection with the construction, operation, and maintenance of a municipal airport is "to be acquired and used for public, governmental and municipal purposes and as a matter of public necessity." The defendants contended that said statutes were controlling, and therefore, the acts of the officers, agents, and employees of the municipalities operating such airport were immune from suits in tort.

In the above-cited case and here, the identical question now before us is one of first impression, and in view of the numerous exceptions to the definitions that

have been laid down in an effort to define what is a governmental function of a municipality and what is a corporate or proprietary one, we deem it proper to examine the decisions from other jurisdictions bearing on the question under consideration. The court said: "The overwhelming weight of authority is to the effect that the construction, operation and maintenance of an airport by a municipality is a proprietary function and that such municipality may be held liable in tort for the negligent operation thereof. Mayor and City Council v. Crown Cork & Seal Co. (C. C. A. Fourth Circuit 1941), 122 F. 2d 385; Peavey v. City of Miami, 146 Fla. 629, 1 So. 2d 614; Pignet v. City of Santa Monica, 29 CA 2d, Cal. 286, 84 P. 2d 166; City of Blackwell v. Lee, 178 Okla. 338, 62 P. 2d 1219; Christopher v. City of El Paso (Texas Civ. App.), 98 S. W. 2d 394; Mollencop v. City of Salem, 139 Ore. 137, 8 P. 2d 783; Coleman v. City of Oakland, 110 Cal. (q.) 715, 295 P. 59; City of Mobile v. Lartigue, 221 Ala. 36, 127 So. 257; Fixel on The Law of Aviation (3d Ed. 1948), p. 198; Aviation Accident Law by Rhyne (1947), p. 149." See, also, Granite Oil Securities v. Douglas County, 67 Nev. 388, 219 P. 2d 191, 16 A. L. R. 2d 1069.

There are cases that tend to support the opposite view, however, it will be observed that in the majority of such cases the statutes are somewhat different than the two sections here being considered.

In Stocker v. City of Nashville, 174 Tenn. 483, 126 S. W. 2d 339, 124 A. L. R. 345, the city of Nashville owned a large park-like area lying beyond the city limits, on which it erected and maintained a municipal airport, pursuant to the provisions of Chapter 116, Public Acts of 1933 (Williams' Annotated Code, Section 2726.22), an act to prohibit the bringing or maintaining of any action or suit against any municipality, or its officers, agents, servants, or employees, in or about the superintendence or management of any municipal airport. This act provided that the construction, maintenance, and

operation of municipal airports was thereby declared a public governmental function, and no action or suit should be brought or maintained against any municipality, or its officers, agents, servants, or employees, in or about the construction, maintenance, operation, superintendence, or management of any municipal airport. The petition charged negligence on the part of the municipality. A demurrer to the petition was sustained. The judgment was affirmed and the suit dismissed. The court held: "The statute declaring the maintenance of municipal airports to be a public governmental function and that no action should be brought against any municipality relating thereto is not unconstitutional on ground of creating an arbitrary classification in that municipal electric plants are subject to suit, since statute applies to all municipalities alike * * *."

In the case of Abbott v. City of Des Moines, 230 Iowa 494, 298 N. W. 649, 138 A. L. R. 120, the court held that the defendant could not be held liable in tort in connection with the operation of its airport, since the liability of a city or town in connection with the operation of its airport was fixed by statute to be "no greater than that imposed upon municipalities in the maintenance and operation of public parks." And the construction and maintenance of a park by a municipality in that state has been repeatedly held to be purely a governmental function. See Smith v. City of Iowa City, 213 Iowa 391, 239 N. W. 29.

Also, in the case of Mayor & Aldermen of Savannah v. Lyons, 54 Ga. App. 661, 189 S. E. 63, the city of Savannah constructed an airport pursuant to special legislative authority, and such airport being repeatedly referred to in the legislative acts as "landing field or park," the court held the airport was a governmental institution in the nature of a park; and the city could not be held liable for the defective maintenance of a road inside the airport. The Legislature of Georgia passed, in 1933, a uniform airport act, Code sections

11-201 to 11-209, which provides, among other things: "Any lands acquired, owned, leased, controlled, or occupied by such counties, municipalities, or other political subdivisions for the purpose or purposes enumerated in section 11-201, shall and are hereby declared to be acquired, owned, leased, controlled, or occupied for public, governmental, and municipal purposes." The fact that this statute declares a municipal airport to be "for public, governmental, and municipal purposes," does not seem to have been considered as controlling on the question of immunity from a tort action.

However, in Caroway v. City of Atlanta, 85 Ga. App. 792, 70 S. E. 2d 126, the court held: "Section 2 of the Uniform Airports Act (Ga. L. 1933, p. 102; Code § 11-202), which provides that lands acquired, controlled, or occupied as landing fields for the use of aircraft shall be so acquired or controlled for public, governmental, and municipal purposes, was intended to be a declaration on the part of the legislature of the public purpose as to which the authorization was given, and not as a limitation immunizing such municipalities from suit regardless of circumstances. * * *." The court, in analyzing the petition wherein the city was sued for tort, held that the city was engaged in a proprietary function and liable to one injured by negligent performance thereof.

As stated in Ex parte Houston, 93 Okl. Cr. 26, 224 P. 2d 281, decided in the latter part of 1950 and reviewing the cases generally, quoting from City of Sand Springs v. Gray, 182 Okl. 248, 77 P. 2d 56: " 'The more recent and better considered rule makes plain the line of demarcation, beyond which a municipality is not to be excused from liability. The test is based upon the nature of the duties with which they are charged. If for the general good of the public they are considered as being strictly governmental, and in case of negligence in their discharge, no liability can attach. But, if they are duties which do not concern the public as a

whole, but which are for the benefit of the municipality in its private or corporate capacity, then the municipality must stand ready to accept liability the same as any private individual or corporation.' "

As stated in Coleman v. City of Oakland, 110 Cal. App. 715, 295 P. 59, quoting from the case of Chafor v. City of Long Beach, 174 Cal. 478, 163 P. 670, Ann. Cas. 1918D 106, L. R. A. 1917E 685: " 'But it is of course true that modern cities and towns enter upon many forms of activity, operate utilities for the benefit of the inhabitants, and provide many means for the easing or improving of the condition of the people that were never dreamed of at common law. Nevertheless the uniform holding as to all such activities, on principle manifestly just to the people themselves, is that no matter how beneficial they may be in a general sense to the inhabitants of the municipality, unless they are governmental in essence, the municipality's conduct in managing them is controlled by the same rules of liabiilty that apply to an individual.' " The court went on to say: "We have no hesitancy in deciding that in the conduct of an air port the municipality is acting in a proprietary capacity. An air port falls naturally into the same classification as such public utilities as electric light, gas, water, and transportation systems, which are universally classed as proprietary. Its nearest analogy is perhaps found in docks and wharves. 'An air port with its beacons, landing fields, run-ways and hangars, is analogous to a harbor with its lights, wharves and docks; the one is a landing place and haven of ships that navigate the water; the other of those that navigate the air.' (Dysart v. St. Louis, 321 Mo. 514 [62 A. L. R. 762, 11 S. W. (2d) 1045].)"

In City of Mobile v. Lartigue, 23 Ala. App. 479, 127 So. 257, it was held that the maintenance of an airport by a city constituted a corporate or proprietary function, and not a governmental function. It was said: "Airports are landing and taking off places for airplanes

which traverse the air instead of, as automobiles and horse-drawn vehicles and railway trains, the land. As stated, they are essentially and primarily an incident to transportation." And it was held that since the maintenance of the airport was a commercial undertaking, the city was not exonerated from liability by the fact that its operations were not profitable.

In Christopher v. City of El Paso (Tex. Civ. App.), 98 S. W. 2d 394, the court, after citing a number of authorities, said: "From these authorities, we have concluded that the operation of the airport in this case was a proprietary function and that the city was liable for the negligence of its agent in such operation the same as other private corporations would have been. We agree with appellee that a determination of whether a city is acting in a governmental or proprietary capacity depends, in a measure, upon the facts of the particular case; but we cannot agree that the Legislature in granting the power to incorporated cities in Texas to own and operate airports made the exercise of such power a governmental function." The court said that provisions of the statute dealing with municipal airports which exempted cities from liability for injuries to persons caused by negligence of their operating agents was unconstitutional, despite presumption in favor of validity of legislative acts, as violating the equal protection clause of the federal Constitution and the due process clause of the state Constitution.

In Peavey v. City of Miami, 146 Fla. 629, 1 So. 2d 614, the court said: "The weight of judicial authority seems to hold the operation of an airdrome by a municipality to be a 'proprietary' function as distinguished from a 'governmental' function. * * * That is, this is true where the municipality does not devote the airport exclusively to municipal or governmental purposes, but undertakes to conduct an enterprise of a commercial character from which it seeks to derive revenue. * * * While the record is silent as to the character of the

use for which the airdrome was maintained, we shall assume that it was of a commercial nature, and therefore the municipality would be liable for any torts committed by it, or its agents, in respect thereto in the same manner and to the same extent that a private operator would be."

We conclude that the distinction between a governmental and a proprietary function of a municipal corporation is a judicial and not a legislative question, and the legislative declaration as to the nature of the authority delegated by the statute is not controlling; and that in the light of the great weight of authority of the courts of this country that have passed on the question, the City of Wahoo was performing a proprietary function in the operation of its municipal airport at the time in question.

The defendant R. F. Cribbett contends that the agreement under which he was operating the Wahoo Municipal Airport was a contract of employment or agency, and that as an employee or agent of the City of Wahoo he is entitled to the immunity granted by the Legislature in section 3-207, R. R. S. 1943. As we view the instrument purporting to be a lease, we believe it comes within a contract of agency. We will not repeat the terms of the agreement, except to say that the City of Wahoo retains certain supervisory authority over the operation of the airport. The agreement requires this defendant to manage and operate the airport in a certain manner and under certain conditions, to do certain things and make certain charges, and sets the extent of charges to be made. If the agreement were a lease, hangar rentals would not be due the city, the city could not give him free use of a hangar for one plane nor of the profits from the sale of gasoline and oil and other commodities sold on the premises, and he would not receive the emoluments as set forth in the lease for his services. He was devoid of control over who could use the airport facilities, and he was without

any right to exclusive possession of any of the airport except that part received by him for his services rendered, as shown by the agreement. Under the circumstances, we believe the following to be applicable.

In Valentine Oil Co. v. Powers, 157 Neb. 87, 59 N. W. 2d 160, this court said: "Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.

"The distinguishing features of agency are its representative character and its derivative authority. Whether a particular relationship is an agency depends on the relations of the parties as they in fact exist, without regard to what they call their relationship." See, also, Restatement, Agency, § 1, p. 7; 2 C. J. S., Agency, § 2, p. 1026.

We are in accord with this defendant's contention as to his relationship to the City of Wahoo. We are not in accord with his contention that bearing such relation to the city he is immune from tort under section 3-207, R. R. S. 1943.

In the light of what we have heretofore said, we conclude that a municipality or the officers, agents, servants, or employees thereof, may be subject to a suit sounding in tort in the operation, superintendence, or management of a municipal airport or other air navigation facility.

For the reasons given herein, we conclude that the trial court committed prejudicial error in sustaining the demurrers of the defendants, and the judgment of the trial court is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.